14 CV 2872

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TONNY UY,

Plaintiff,

- against -

ASMALLWORLD HOLDINGS, INC., ASM MEDIA CONSULT CORP., and ASMALLWORLD AG,

Defendants.

14 Civ.

COMPLAINT

JURY TRIAL DEMANDED

Plaintiff Tonny Uy ("Uy" or "plaintiff"), through his attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendants ASMALLWORLD Holdings, Inc., ASM Media Consult Corp., and ASMALLWORLD AG (collectively "ASW" or "defendants") as follows:

## NATURE OF ACTION

1. Plaintiff brings this action to remedy discrimination on the basis of gender and retaliation for his opposition to unlawful employment practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); the District of Columbia Human Rights Act, 2 D.D.C. 1-2501, et seq. (DCHRA"); and the Maryland Civil Rights Act, Md. Code, State Gov't § § 20-101 et seq. ("MCRA").

2. Plaintiff seeks lost wages, compensatory and punitive damages, and other appropriate legal relief.

PARTIES, JURISDICTION and VENUE

3. Uy worked for ASW from July 2007 until the involuntary termination of his employment on June 21, 2013. Uy is a citizen of the District of Columbia ("DC").

4. Defendant ASMALLWORLD Holdings, Inc., is company running a social network, incorporated in Delaware and headquartered in New York. Upon information and belief, in or about 2012 or 2013 ASMALLWORLD Holdings, Inc. was merged into ASM Media Consult Corp., which is incorporated in Delaware and headquartered in New York. ASMALLWORLD Holdings, Inc., and ASM Media Consult Corp. are employers within the meaning of Title VII, the DCHRA and the MCRA.

5. Defendant ASMALLWORLD AG is established under the laws of Switzerland and headquartered in Switzerland. ASMALLWORLD AG is an employer within the meaning of Title VII, the DCHRA, and the MCRA.

6. Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3). This Court has diversity jurisdiction over plaintiff's DCHRA and MCRA claims because the parties are citizens of different states and/or countries and the amount in controversy exceeds $75,000. The Court also has supplemental jurisdiction over plaintiff's DCHRA and MCRA claims pursuant to 28 U.S.C. § 1367.

7. Venue is proper in this District pursuant to 42 U.S.C.. § 2000e-f(5)(3) and 28 U.S.C. § 1391 because defendants' employment records are within the Southern District of New York and it regularly conduct business within the Southern District of New York.

8. On or about July 10, 2013, plaintiff filed a charge of discrimination against defendants with the United States Equal Opportunity Employment Commission (the "EEOC"). On or about January 24, 2014, at plaintiff's request, the EEOC issued plaintiff a notice

informing him of his right to sue under Title VII, which was received on January 27, 2014. Plaintiff has thus complied fully with all prerequisites required by Title VII.

FACTUAL ALLEGATIONS

9. Uy is a man who worked for ASW from July 2007 until the involuntary termination of his employment on June 21, 2013.

10. ASW was an invitation-only social networking site geared toward business people and socialites.

11. ASW initially hired Uy as a temporary employee in July 2007. In September 2007, ASW made his employment as Accountant permanent.

12. In or about September 2008 ASW promoted Uy to Senior Accountant.

13. Initially Uy worked in the New York office.

14. In November 2011, Uy moved to the Washington, DC area with his husband. ASW allowed Uy to work remotely from his new home in Maryland. Uy was not the only employee to work remotely.

15. Throughout Uy's employment he reported to Jaime Lee ("Lee"), Director of Finance. Lee reported to Chief Executive Officer Sabine Heller ("Heller").

16. Until January 2012, Uy received positive feedback about his performance and was given raises when ASW's budget permitted.

17. The ASW handbook stated that employees could take up to 12 weeks of family leave for, among other things, the birth of a child. How much of the leave was paid varied by length of service. Employees – like Uy – who had been employed more than four years, were entitled to be paid for 40 days of that leave. Male employees, regardless of length of

service, were entitled to an additional five days of paternity leave. Female employees with Uy's tenure were entitled to 40 days of paid maternity leave.

18. On or about February 2, 2012, Uy sent Lee an email requesting family leave because he and his husband were expecting the birth of their baby in March. In Uy's email, he set forth his understanding of how much paid time off he was entitled to. Because Uy thought it would be disruptive to ASW if he took all the time off consecutively, he proposed that after taking his paid paternity leave following the birth of his daughter, he would then take off two days per week as "flex days." Uy attached a proposed calendar.

19. On February 7, 2012, Lee responded that the leave was approved, but that it would be unpaid. Uy responded the same day asking why he would not be entitled to 40 days of paid leave and asking that Lee re-check the employee handbook.

20. After Uy pressed the issue a few times, on February 13, 2012, Lee finally confirmed that Uy's family leave would be paid.

21. After Uy's paid leave was approved, there was a change in Lee's attitude toward him. She was cool in her interactions with him, and she began to be critical of his performance.

22. On or about April 10, 2012, Lee called Uy. She said she was "forewarning" him that his employment would likely be terminated by June. While they were on the phone, Uy pulled up the ASW budget, which was on the ASW intranet. It showed Uy's salary ending at the end of May and a new "Assistant Bookkeeper" starting in June. During the call Lee complained that Uy had taken off a lot more time than other employees who had had children. Uy said that he was just taking off what he was entitled to, and that he had worked at ASW longer than the other employees who took leave. Lee said that the benefits Uy had

requested should not have been offered in the first place and said that would need to be "fixed." Uy asked Lee if ASW would at least let him work until the end of his planned flex-leave, in late August. Lee became angry and said, "Really, Tonny, is that how you are going to be?"

23. After the April 10, 2012 call Uy went back onto the intranet to check the budget and it had disappeared. That same day, Lee updated a job posting that described, in broad terms, Uy's job duties, but with a more junior title. Around the time of this call, Lee also had communications with a recruiting company to assist with filling that position.

24. On May 2, 2012, Uy sent Lee an email stating, among other things, that he thought he was being treated differently from women who had taken family leave and that he knew she was posting a job that was essentially his.

25. In fact, ASW not only gave two female employees paid family leave, it gave paid family leave to two female independent contractors who were not entitled to paid leave under ASW policy. The women did not suffer any adverse actions for taking paid family leave. One of the women took paid leave twice, once before Uy and once after him; upon her return ASW promoted her and gave her a raise without a significant change in her duties. Upon information and belief, no other male employee has taken family leave when his children were born. One of the men who had a child was also promoted and given a raise after the birth of his child, even though he did not reach his defined goals for the year.

26. Shortly after Uy sent the May 2, 2012 email complaining about discrimination, Lee contracted with the company that processed ASW's payroll to add Human Resources-related services, including revising the employee handbook.

27. On May 9, 2012, Heller called Uy to schedule a telephone meeting for May 10, 2012. Heller claimed not to be aware that Lee was planning to terminate Uy's

employment, even though Heller and Lee worked closely together on the budget. Heller spoke about either finding a way for Uy and Lee to work together or paying Uy to leave the company.

28. On or about June 6, 2012, Uy's attorneys delivered a letter to Heller by email and mail, stating he had claims for gender discrimination and retaliation.

29. During the spring and summer of 2012, Lee retaliated against Uy in a variety of ways, including removing his access to the payroll system; removing his access to the online company credit card data; removing his access to company files; monitoring his emails when no one else's emails were monitored; reprimanding him for things that had never been raised as issues before; attempting to assign responsibilities to him that he could not perform because they were tasks for which employees in other departments were responsible; withholding information about company changes; and making false complaints to Heller about his performance.

30. On or about September 24, 2012, Uy spoke to Heller by phone. Heller said that she felt like she "had a gun to [her] head," and that ASW's attorneys had told her that she had to keep him or ASW would be sued for retaliation. She also said that she was "surprised" Uy was not looking for a job elsewhere.

31. Lee continued to withhold information from Uy, exclude him from communications, and look for excuses to criticize him.

32. In the fall of 2012, Uy moved to DC and worked out of his new home there.

33. In October 2012, Lee hired Zai Li ("Li"), paid as an independent contractor through an agency, to fill the position of Office Manager. Li worked full-time and performed a number of accounting/finance functions. Li has a degree in finance.

34. On or about December 20, 2012, Uy learned about the formation of ASMALLWORLD AG, a Swiss company, and that ASMALLWORLD Holdings was merging with ASM Media Consult Corp. Those corporate changes increased Uy's workload.

35. On or about December 23, 2012, Heller emailed Uy to "check in." She said she had not been able to reach him by phone. They had an email exchange in which she expressed concern about not being able to reach him and wondered if problems with his phone was affecting his work. Uy clarified that she had tried to reach him on his personal phone, but that his work phone had no problems. Uy also told her that he was still being treated differently from other employees and it made his job more difficult when information was kept from him.

36. On December 28, 2012, Heller emailed Uy that his feelings were not justified and that she would deal with the situation after the holidays.

37. On January 3, 2013, Heller emailed Uy that the position he was in and his feelings about his treatment were his own fault for moving away from New York. She said that Uy needed to be more "proactive" and help Lee, specifically referring to the formation of the Swiss company and the merger. Uy replied that he could not be "proactive" about things he was not being told about, and that he was in fact assisting Lee now that he had the necessary information. Uy also said that no one raised any issues about his move until months after the move, when he complained about being treated differently from women who took family leave and his job being threatened because he asked for paid leave.

38. Throughout the spring of 2013, Lee continued to try to blame Uy for things that were the fault and responsibility of others.

39. Employees in New York told Uy that Lee was regularly absent from the New York office a few days per week and rarely arrived before 11 am. Upon information and

belief, Lee was working remotely from her home during these absences, just as Uy worked remotely from his home. Lee also assigned to Uy new duties that were previously her responsibility, including updating and maintaining the company revenue report.

40. On March 18, 2013, ASW issued a new employee handbook. The new handbook did not provide for any paid family leave.

41. On the afternoon of Friday, June 7, 2013, Lee emailed Uy saying that his job was being eliminated as of June 21, 2013. The email included a severance agreement offering him two weeks of pay to release all claims. Lee's email said he had to sign the agreement by Monday, June 10, 2013.

42. After Uy was given notice of his termination, he learned that Li had been made a full-time staff member in early May 2013. Upon information and belief, Li assumed Uy's old responsibilities.

## FIRST CAUSE OF ACTION
## Gender Discrimination Under Title VII

43. Plaintiff repeats and realleges paragraphs 1-42 of this Complaint as if fully set forth herein.

44. By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of his employment on the basis of his gender in violation of Title VII.

45. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and mental anguish, humiliation and damage to reputation, as a result of defendants' discriminatory practices unless and until this Court grants relief.

46. Defendants engaged in these discriminatory practices with malice and with reckless indifference to plaintiff's rights protected under federal law.

SECOND CAUSE OF ACTION
Retaliation Under Title VII

47. Plaintiff repeats and realleges paragraphs 1-46 of this Complaint as if fully set forth herein.

48. By the acts and practices described above, defendants retaliated against plaintiff for his opposition to unlawful employment practices, in violation of Title VII.

49. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and mental anguish, humiliation and damage to reputation, as a result of defendants' retaliatory practices unless and until this Court grants relief.

50. Defendants engaged in these retaliatory practices with malice and with reckless indifference to plaintiff's rights protected under federal law.

THIRD CAUSE OF ACTION
Gender Discrimination Under the DCHRA

51. Plaintiff repeats and realleges paragraphs 1-50 of this Complaint as if fully set forth herein.

52. By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of his employment on the basis of his gender in violation of the DCHRA.

53. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and mental anguish, humiliation and damage to reputation, as a result of defendants' discriminatory practices unless and until this Court grants relief.

54. Defendants engaged in these discriminatory practices with malice and with reckless indifference to plaintiff's rights protected under the law.

FOURTH CAUSE OF ACTION
Retaliation Under the DCHRA

55. Plaintiff repeats and realleges paragraphs 1-54 of this Complaint as if fully set forth herein.

56. By the acts and practices described above, defendants retaliated against plaintiff for his opposition to unlawful employment practices in violation of the DCHRA.

57. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and mental anguish, humiliation and damage to reputation, as a result of defendants' retaliatory practices unless and until this Court grants relief.

58. Defendants engaged in these retaliatory practices with malice and with reckless indifference to plaintiff's rights protected under the law.

FIFTH CAUSE OF ACTION
Gender Discrimination Under the MCRA

59. Plaintiff repeats and realleges paragraphs 1-58 of this Complaint as if fully set forth herein.

60. By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of his employment on the basis of his gender in violation of the MCRA.

61. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and mental anguish, humiliation and damage to reputation, as a result of defendants' discriminatory practices unless and until this Court grants relief.

62. Defendants engaged in these retaliatory practices with malice and with reckless indifference to plaintiff's rights protected under the law.

FOURTH CAUSE OF ACTION
Retaliation Under the MCRA

63. Plaintiff repeats and realleges paragraphs 1-62 of this Complaint as if fully set forth herein.

64. By the acts and practices described above, defendants retaliated against plaintiff for his opposition to unlawful employment practices in violation of the MCRA.

65. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and mental anguish, humiliation and damage to reputation, as a result of defendants' retaliatory practices unless and until this Court grants relief.

66. Defendants engaged in these retaliatory practices with malice and with reckless indifference to plaintiff's rights protected under the law.

PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a Judgment:

(a) declaring that defendants' conduct complained of herein violates plaintiff's rights under Title VII, the DCHRA and the MCRA;

(b) enjoining and permanently restraining defendants from violating Title VII, the DCHRA and the MCRA;

(c) directing defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) directing defendants to reinstate plaintiff to the position he would have occupied but for defendants' discriminatory and otherwise unlawful conduct and making him whole for all earnings and other benefits he would have received but for defendants' discriminatory treatment including, but not limited to, wages, bonuses, and other lost benefits;

(e) directing defendants to pay plaintiff compensatory damages for his mental anguish, humiliation and damage to his reputation;

(f) directing defendants to pay plaintiff punitive damages;

(g) directing defendants to pay plaintiff's attorneys' fees, costs and disbursements;

(h) directing defendants to compensate plaintiff for any adverse tax consequences;

(i) directing defendants to pay prejudgment interest; and

(j) granting such other and further relief as this Court deems necessary and proper.

DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
April 23, 2014

VLADECK, WALDMAN, ELIAS
& ENGELHARD, P.C.

By: ______________________
Anne L. Clark
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300